Filed 1/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

THE PEOPLE,

    Plaintiff and Respondent,

         v.

VICTOR ESPUDO RAMIREZ, JR., et al.,

    Defendants and Appellants.

G049935

(Super. Ct. No. RIF148423)

O P I N I O N

Appeal from a judgment of the Superior Court of Riverside County, Christian F. Thierbach, Judge. Reversed.

Leslie Conrad, under appointment by the Court of Appeal, for Defendant and Appellant Victor Ramirez.

Eric Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant Armando Ramirez, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr. and Randall D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Victor Espudo Ramirez, Jr., and his brother Armando Apolinar Ramirez of first degree murder (Pen. Code, § 187, subd. (a); all further statutory references are to this code) and active participation in a criminal street gang (§ 186.22, subd. (a)). The jury found true a gang special circumstance allegation on the murder count (§ 190.2, subd. (a)(22)), and also found true a gang enhancement (§ 186.22, subd. (b)) and firearm enhancement (§ 12022.53, subds. (d), (e)) on that count.

Defendants contend the trial court erroneously prevented the jury from considering their self-defense claim by instructing the jury categorically that "[a] person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." (CALCRIM No. 3472.) The prosecutor argued repeatedly based on the plain terms of this instruction that even if the jury believed defendants sought to provoke only a fistfight, their bare intent "to use force" as stated in the instruction — even nondeadly fisticuffs — meant they forfeited a claim of imperfect self-defense. We hold the instruction misstated the law. A person who contrives to start a fistfight or provoke a nondeadly quarrel does not thereby "forfeit[] his right to live." (*People v. Conkling* (1896) 111 Cal. 616, 626 (*Conkling*). Instead, he may defend himself "even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179-1180 (*Vasquez*).)

The trial court sentenced defendants to life in prison without the possibility of parole, plus a term of 25 years to life for the firearm use. Based on the instructional error, we reverse the judgment.

## I

## FACTUAL BACKGROUND

In January 2009, defendants were members of the street gang known as La Sierra Brown Knights (La Sierra). Armando lived with his mother, her boyfriend, Armando's sister, his fiancée, and his son. For several months, members of one of

2

La Sierra's rivals, the street gang known as Tiny Winos, would drive by Armando's house, flashing gang signs and guns. On two occasions they shot at the house.

On January 27, 2009, Victor called his friend, Steven Arevalos, who was also a member of La Sierra, to try to put an end to the harassment. Arevalos agreed to accompany Victor and Armando, believing they were "just gonna go over there and just confront them and, if anything, we were just gonna fight." Arevalos agreed to drive but vetoed Armando's request to bring a gun, even though Arevalos believed their adversaries would be armed. Armando seemed to comply with Arevalos's request, returning into his home to stash his .38-caliber handgun, but Armando thought better of leaving the gun behind because he knew firsthand the Tiny Winos gang carried weapons, having shot up his house. He put the gun in his sweatshirt pocket and returned to Arevalos's car. He did not set out intending to shoot anyone.

Armando and Victor hoped they could find Mario, a Tiny Winos member who earlier had interceded at Victor's request to stop the harassment. At that time, Armando and Victor's mother had been seeing Mario's uncle, but the pair no longer dated.

Defendants and Arevalos drove to an apartment complex to look for Mario. Instead, they found Ruben Rivera and six or seven other Tiny Winos members in front of the building. Members of the group later acknowledged at trial that defendants asked to no avail for "Mario," and that a Tiny Winos gang member may have thrown the first punch.

Other testimony suggested Armando, Victor, and Arevalos confronted the group aggressively, demanding to know, "Do you have a problem with La Sierra," and issuing the gang challenge, "Where you from?" A fistfight broke out "instaneous[ly]." The prosecution's gang expert explained at trial that in a confrontation between members of rival gangs, "[W]hen they're asking you where you're from, they're specifically asking you what gang you claim, and that's the purpose of it." The question is known as "hitting

3

up" a rival. The expert testified that in his experience, "[M]ore often than not, when somebody gets hit up by a rival gang member, there's generally going to be some kind of violence, at the minimum, a fistfight."

Armando testified that as soon as the fight broke out, Arevalos and Victor were each double-teamed by Tiny Winos assailants. "Two or three" guys were on Victor and Arevalos had "two or three guys on him." Armando stepped back from the fighting as Rivera walked toward the group. Armando testified "it looked like [Rivera] had something black in his hand," and as Rivera approached, he raised his hand, holding an object that "looked like a gun." Armando pulled his gun from his sweatshirt pocket and fatally shot Rivera. The fighting stopped, and defendants and Arevalos sped away in their car. Other than Armando's testimony, no evidence showed Rivera or the any of the other Tiny Winos members had a gun that night. Armando claimed he reacted in self-defense and to defend his companions.

II

DISCUSSION

Defendants contend the trial court's instructions prevented the jury from considering their self-defense claim, an error the prosecutor compounded by repeated misstatement of the law reflected in those instructions. Under the facts of this case, we agree.

""""It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." [Citation.]'" (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) This instructional duty "prevents the 'strategy, ignorance, or mistakes' of *either* party from presenting the jury with an 'unwarranted all-or-nothing choice,' encourages 'a verdict . . . no harsher *or more lenient* than the evidence merits'

4

[citation], and thus protects the jury's 'truth ascertainment function' [citation]." (*Id*. at p. 155, original italics.)

Here, defendants argue the trial court's instruction on contrived self-defense erroneously directed the jury to conclude a person has *no* right of self-defense against an adversary's deadly attack, even if the defendant contrived to provoke a confrontation to use only nondeadly force against the adversary. The trial court instructed the jury with CALCRIM No. 3472, including its title, "Right to Self-Defense: May Not Be Contrived." The instruction provided: "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." The instruction made no allowance for an intent to use only nondeadly force and an adversary's sudden escalation to deadly violence.

The prosecutor highlighted the instruction in closing argument. The prosecutor argued it precluded any claim of self-defense even if defendants only instigated a fistfight. Indeed, the prosecutor acknowledged the evidence reflected a fistfight as defendants' likely intent: "Nothing about the way that they approached, what they said, what they did, indicated anything but expecting and wanting a fight with the Tiny Winos. [¶] I am not saying expecting and wanting murder. I am saying expect[ing] and wanting a fight." Invoking the contrived self-defense instruction, however, the prosecutor continued: "But remember, we are talking about *are they entitled* to self-defense if they went there *intending to provoke a fight and use force*? And if you find that they did, they are not entitled to that protection." (Italics added.)

The prosecutor argued the instruction precluded a claim of self-defense in all possible circumstances under the evidence, i.e., whether "one, . . . Ruben Rivera actually had a gun; two, Armando thought Ruben had a gun; or three, the whole Ruben-had-a-gun theory is made up . . . ." The prosecutor acknowledged frankly that Rivera may have had a gun: "[T]o be quite honest, ladies and gentlemen, they [the Tiny Winos group] are gangsters. Can we really believe none of them had a gun?" Nevertheless, the

5

prosecutor insisted under CALCRIM No. 3472 that it did not matter. "Was there a gun in Ruben's hands? I am going to quickly go over the reasons for yes. I am going to quickly go over the reasons for no. But I want to stress, either way, it doesn't matter. Because [CALCRIM No.] 3472 says a person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."

Relying on CALCRIM No. 3471, defense counsel argued in closing argument that the lesser charge of manslaughter might apply, but insisted Armando regained a right to defend himself against murder charges if he truly believed Rivera suddenly escalated the fistfight to a gunfight.[1] The prosecutor, however, invoked CALCRIM No. 3472, arguing, "[Y]ou cannot have the princip[le] to mitigate from murder to voluntary manslaughter . . . when you are the one who created the circumstances to begin with. It makes sense. It's fair. It's just. More importantly, it's the law." The jury's copy of the jury instructions reflects that in reaching its verdict, the jury circled CALCRIM No. 3472.

CALCRIM No. 3472 under the facts before the jury did not accurately state governing law. The blanket rule articulated in CALCRIM No. 3472 and reiterated by the prosecutor effectively told the jury, "A person does not have [*any*] right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use [*any*] force." In effect, the prosecutor and the trial court advised the jury that one who provokes a fistfight

---

[1] CALCRIM No. 3471 provides that a person who "engages in mutual combat" or "starts a fight" ordinarily has "a right to self-defense" only if three criteria are met: he actually and in good faith tried to stop fighting; communicated to his opponent "by word or conduct" this intent to cease fighting; and gave the opponent a chance to stop fighting. As defense counsel explained, these criteria need not be met where the opponent suddenly resorts to deadly force in response to a defendant's nondeadly attack. CALCRIM No. 3471 provides: "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."

6

forfeits the right of self-defense if the adversary resorts to deadly force. The adversary simply may stab or shoot a person who contrives what he thought would be a shoving match or fisticuffs. According to the prosecutor and the trial court's instruction: "A person does not have the right to self-defense" in those circumstances.

To the contrary, cases dating to 1896 invalidate jury instructions that wrongly suggest "the party first at fault — the one beginning the affray — absolutely forfeits to the other his right to live . . . ." (*Conkling*, *supra*, 111 Cal. at p. 626.) In other words, it is wrong to instruct the jury that: "Having committed the first wrongful act, the plea of self-defense is foreclosed to him, and his life is the penalty, no matter what turn the affray may subsequently take." (*Ibid.*) Similarly, for example, imperfect self-defense is available "when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Vasquez*, *supra*, 136 Cal.App.4th at pp. 1179-1180.)

True, CALCRIM No. 3472 states a correct rule of law in appropriate circumstances. Thus, a victim may respond to an attacker's initial physical assault with a physical counterassault, and an attacker who provoked the fight may not in asserting he was injured in the fray claim self-defense against the victim's lawful resistance. (See, e.g., *Fraguglia v. Sala* (1936) 17 Cal.App.2d 738.) And when a defendant contrives a "deadly" assault (e.g., *People v. Hinshaw* (1924) 194 Cal. 1, 26 (*Hinshaw*)), there can be no incommensurate or unjustifiable response by the victim: he or she is fully entitled to use deadly force and the defendant has no right to claim self-defense against those deadly measures.

For example, in *People v. Enraca* (2012) 53 Cal.4th 735 (*Enraca*), the evidence showed the defendant shot two victims at close range in the back of the head, execution-style. The defendant's version of events established the victims were entitled to use deadly force to meet his deadly actions, and therefore the trial court did not err in instructing the jury with CALCRIM No. 3472's antecedent that a defendant who

7

contrives to use force may not claim self-defense. Specifically, the defendant told investigators the first victim (Hernandez) slapped at the defendant's gun when the defendant pulled Hernandez's head back, and the defendant shot Hernandez because he thought Hernandez was reaching for a gun in the other victim's possession. Having shot Hernandez, the defendant also shot the other victim (Gobert) because he believed Gobert was reaching for the same (nonexistent) gun as Hernandez. As the Supreme Court explained, there was nothing unreasonable or unpredictable in the victims' supposed responses: "Hernandez responded to being pulled up by the hair by an armed assailant, and Gobert acted in resistance to Hernandez being killed." (*Enraca*, *supra*, 53 Cal.4th at p. 760.) Thus, there was no possible error in the trial court's instruction on contrived self-defense. Simply put, a defendant who assaults his victims with a gun may not set up a valid self-defense claim with evidence he believed the victims also reached for a gun, since they would be justified in meeting deadly force with deadly force. The evidence justified the contrived self-defense instruction there. (*Id.* at pp. 761-762.)

As noted, the trial court's sua sponte duty to instruct the jury on the applicable principles of law derives from the facts before it. Here, defendants sought to invoke in other instructions the principle that one who provokes a nondeadly confrontation nevertheless may defend himself or herself against the victim's unjustified use of deadly force. Both defense counsel in closing argument relied on instructions describing an initial aggressor or mutual combatant's revived right of self-defense if an opponent in a nondeadly confrontation suddenly resorts to deadly force (CALCRIM No. 3471) and mitigation of murder to voluntary manslaughter where the defendant honestly but mistakenly believes the immediate use of deadly force is necessary to defend himself or others (CALCRIM No. 571).

But the prosecutor in rebuttal emphasized the plain words of CALCRIM No. 3472 precluded these defenses. The prosecutor stated: "And with all due respect to [defense counsel], I completely disagree with how he read to you the law or explained to

8

you the law.  And that's the beauty of it.  *It's on paper*.  Okay.  And you *cannot have* the principle of self-defense — you *cannot have* the principle to mitigate from murder to voluntary manslaughter, heat of passion or sudden quarrel *when you are the one who created that circumstance to begin with*."  (Italics added.)  The prosecutor emphasized defense counsel "read to you only a certain portion, [CALCRIM No.] 3471[,] of [the law of] self-defense.  But of course I read [CALCRIM No. 3472], which is the one after, and *that is you can't create the situation*.  Self-defense may not be contrived, actually; is the title of it.  And we covered that."  (Italics added.)  The prosecutor earlier had summarized her argument using CALCRIM No. 3472 categorically, as follows:  "You can't go looking for trouble and then complain about the trouble that you find.  That's what that instruction says."

As noted, she explained that whatever defendants claimed occurred, "it doesn't matter because of that, of [CALCRIM No.] 3472."  Thus, whether "Rivera actually had a gun," or Armando only "thought Ruben had a gun," or "the whole Ruben-had-a-gun theory is made up," the prosecutor stressed, "[I]t doesn't matter."  "Because [CALCRIM No.] 3472 says a person does not have the right to self-defense if he provokes a fight or a quarrel with the intent to create an excuse to use force."

The Attorney General does not address the prosecutor's misstatement of the law of self-defense, and indeed concedes defendants had a right to defend themselves if the facts were as they claimed.  "[F]or example," as the Attorney General notes, "if Armando instigated a fist fight, and Ruben suddenly responded with a firearm so that Armando could not withdraw from the fight, Armando had the right to defend himself with deadly force."  But "if Armando instigated the fist fight with the intent to create an excuse for him *to shoot* Ruben, self-defense did not apply."  (Italics added.)

According to the Attorney General, when read together, CALCRIM Nos. 3471 and 3472 preserve this distinction between contriving to provoke a quarrel to use nondeadly force in a fistfight and contriving to provoke a quarrel to use *deadly* force.

9

Alternatively, the Attorney General argues that any ambiguity in the intersection of CALCRIM Nos. 3471 and 3472 made it defendants' burden to request a clarifying instruction, and failure to do so forfeits their challenge. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570.)

The court may not, however, cast upon the parties its responsibility to instruct the jury accurately. It is the trial court's statutory duty to instruct on the law applicable to the facts of the case (§§ 1093, subd. (f), 1127), including the defendant's theory of defense (*People v. Ponce* (1996) 44 Cal.App.4th 1380, 1386.) The trial court has a sua sponte duty to instruct the jury on an affirmative defense "even in the absence of a request, 'if it appears the defendant is relying on such a defense,'" as here, "'or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 469.) Although no particular form of jury instructions is required, the court has a duty to ensure that the instructions provide a complete and accurate statement of the law. (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370; *People v. Martinez* (1984) 157 Cal.App.3d 660, 667.) Where, as here, the trial court's failure to properly instruct the jury affects the defendant's substantial rights, the defendant's failure to object does not bar the appeal. (§ 1259; *People v. Brown* (2003) 31 Cal.4th 518, 539, fn. 7; *People v. Thomas* (2013) 218 Cal.App.4th 630, 643.)

Here, as the prosecutor repeatedly emphasized to the jury, the plain words of CALCRIM No. 3472 do not support the Attorney General's attempt to harmonize the instruction with CALCRIM No. 3471. As the prosecutor observed, the discrepancy between the instructions is evident "on paper" in the black-and-white terms of CALCRIM No. 3472. That is, contriving to use any amount of "force" entirely precluded defendants' self-defense claim, whether Rivera actually drew a gun to escalate the confrontation to deadly force or Armando only thought he did. Nothing in CALCRIM No. 3472 reflected that Armando had to intend to shoot Rivera or use other deadly force

10

against him as a basis for precluding defendants from invoking perfect or imperfect self-defense. Instead, under CALCRIM No. 3472's plain terms, any "force" sufficed to preclude the defense. As the prosecutor repeatedly emphasized, under CALCRIM No. 3472's command, "it doesn't matter" whether under CALCRIM No. 3471 the original victim escalated a nondeadly conflict to deadly proportions. Rather, CALCRIM No. 3472 admits no exceptions in foreclosing self-defense where a defendant contrives to start a quarrel as a pretext to use "force," whether deadly or nondeadly. The instruction misstates the law.

The Attorney General attempts to draw a vague, unspecified distinction in which CALCRIM Nos. 3471 and 3472 only "pertain to the complete defense of self-defense, not the mitigating defense of imperfect self-defense." But whatever the value in such a distinction, if any, it does not hold for several reasons. First, the Attorney General does not maintain the distinction, nor did the prosecutor. Specifically, the Attorney General suggests in her briefing that CALCRIM No. 3471 applies only to so-called "complete" defense requiring an acquittal "if Armando instigated a fist fight, and Ruben suddenly responded with a firearm." But two pages later she describes the instruction as equally applicable to "*imperfect* self-defense if [defendants] provoked [Ruben's group] with words or punches, and thereafter Ruben escalated from fisticuffs to deadly force . . . ." (Italics added.) As noted, the prosecutor in a different fashion did not maintain the distinction either: she erroneously argued CALCRIM No. 3472 obliterated all forms of self-defense — both perfect and imperfect self-defense alike — if the defendant contrives to use any force.

Second, the Attorney General and the prosecutor are wrong. Contrary to the Attorney General's attempt to make a distinction in which CALCRIM No. 3471 applies only to complete self-defense, a defendant may claim *imperfect* self-defense when faced with the original victim's sudden escalation to deadly force. (*People v. Quach* (2004) 116 Cal.App.4th 294 (*Quach*); *Vasquez*, *supra*, 136 Cal.App.4th at pp. 1179-

11

1180.)  Similarly, the prosecutor was wrong to suggest defendants were precluded from asserting a valid self-defense claim of any kind.  Though a defendant "set[s] in motion the chain of events that led the victim to attack the defendant," he or she still may assert a claim of self-defense.  (*Vasquez*, at pp. 1179-1180.)

In *Vasquez*, a wheelchair-bound defendant who had a hidden gun provoked a confrontation with the victim in an alleyway to accuse the victim of molesting the defendant's younger brother.  The victim responded by lunging at the defendant and attempting to choke him, whereupon the defendant shot and killed him.  The trial court denied the defendant's request for an imperfect self-defense instruction, finding as a factual matter the defendant could not have feared for his life since he had a firearm.  (*Vasquez*, *supra*, 136 Cal.App.4th at pp. 1179-1180.)

Nothing in the record, however, "suggest[ed] appellant was pointing a gun, or that his gun was even visible, when Arechiga [the victim] lunged toward him." (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1178, fn. 1.)  As the reviewing court explained, "It was for the jury sitting as the trier of fact to decide whether appellant actually feared serious injury or death from being choked." (*Id.* at p. 1179.)  The *Vasquez* court observed:  "That appellant had a gun to rebuff Arechiga's attack does not mean appellant could not have believed his life was in peril — in fact, a defendant claiming imperfect self-defense will *always* have had the means to rebuff the victim's attack, or else the homicide would not have occurred.  In our holding it was the jury's role to determine appellant's state of mind, we do not ignore the plentiful evidence suggesting appellant's criminal intent in the alley." (*Ibid.*)  The court noted that "a reasonable jury could have concluded that in creating the situation appellant intended to kill all along." (*Id.* at p. 1179, fn. 2.)  But "[a] reasonable jury could also have concluded that appellant only intended to confront Arechiga with the accusation of rape and it was only after Arechiga attacked him that appellant formed the intent to kill." (*Ibid.*)

12

The *Vasquez* court explained the trial court and the Attorney General "interpreted imperfect self-defense too narrowly" in suggesting "the defense is not available to a defendant who '*induces a quarrel that leads to an adversary's attack.*'" (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1179, italics added.) These italicized words echo the words of CALCRIM No. 3472. But *Vasquez* explained: "Neither the court nor respondent is precisely correct. Imperfect self-defense does not apply if a defendant's conduct creates circumstances where the victim is *legally* justified in resorting to self-defense against the defendant." (*Ibid*., original italics.) "But the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Id.* at pp. 1179-1180.) Accordingly, the *Vasquez* court reversed for a retrial.

The same result is required here. While the trial court instructed the jury that a claim of imperfect self-defense reduces murder to the lesser-included offense of voluntary manslaughter if the defendant honestly but mistakenly believed deadly force was necessary (CALCRIM No. 571), CALCRIM No. 3472 as given here and as argued by the prosecutor erroneously foreclosed defendants' imperfect self-defense claim. On the prosecutor's motion, the trial court instructed the jury with a modified version of the standard imperfect self-defense instruction, CALCRIM No. 571. This "Special Instruction Regarding Wrongful Conduct" told the jury: "The principle of imperfect self-defense may not be invoked by a defendant who, through his own wrongful conduct (e.g., the invitation of a physical assault or the commission of a felony) has created circumstances under which his adversary's attack or pursuit is legally justified."

This instruction did nothing to counteract CALCRIM No. 3472's categorical terms or the prosecutor's argument that purported to absolutely bar a defendant's claim of self-defense if he or she contrived to use "force." To the contrary, the instruction presented an *additional* reason to preclude the defendants' self-defense claim if the victim used "legally justified" force, but without limiting what was "legally

13

justified" in response to contrived force. Indeed, in light of CALCRIM No. 3472's absolute terms barring a defendant's claim of self-defense even if he or she contrived to use only nondeadly force, and given the prosecutor's forceful argument that "it did not matter" whether Rivera was actually armed or Armando believed he or his companions were about to be shot, the jury was misled on the law of self-defense. Rivera was *not* legally entitled to use deadly force *if* the jury believed defendants' claim they only intended to use nondeadly force and presented no deadly threat.

The Attorney General argues Victor forfeited his challenge on appeal by requesting CALCRIM No. 3472. Victor's trial counsel checked a box for "3472  rt. to self-defense" in his preprinted form request for jury instructions. Counsel did so apparently without realizing the instruction erroneously stated the law relevant to his defense, precluding his reliance on Armando's self-defense and defense of others defense against the murder charge. On appeal, Victor correctly observes there is no conceivable tactical reason for requesting an instruction that eliminates one's defense. Consequently, because he received ineffective assistance of counsel and we cannot say the jury would have rejected defendants' defense if it had been properly instructed, Victor's challenge is not forfeited. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-687; *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

The Attorney General argues the instructional error was harmless given the jury's true findings on the gang special circumstance (§ 190.2, subd. (a)(22)) and the gang enhancement (§ 186.22, subd. (b)). The Attorney General suggests that because the jury found defendants intended to kill Ruben to further and promote their gang, any notion of self-defense was explicitly rejected by the jury. The Attorney General's argument fails, however, precisely because the jury was misled by CALCRIM No. 3472. The jury cannot be said to have rejected defendants' imperfect self-defense claim where the instructions erroneously required them to reject the claim.

14

In essence, the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense. The instructions and the prosecutor's argument established as a matter of law that defendants were not entitled to imperfect self-defense if they contrived to use *any* force, even nondeadly force, but that was a question for the jury to decide on its own evaluation of the facts. (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1179, fn. 2; *Quach*, *supra*, 116 Cal.App.4th at p. 304 [federal constitutional error in instructions where "[w]e cannot be convinced beyond a reasonable doubt that no jury could have adopted Quach's version of the facts"].)[2]

---

[2]     Our dissenting colleague concludes CALCRIM No. 3472 as given correctly precludes CALCRIM No. 3471's lethal escalation defense because a defendant is "*not permitted* to assert the right of self defense if [he] initially engaged in that activity for the purpose of contriving the opportunity to engage in *further violence* in response to [his] adversary's reaction." (Italics added.) According to the dissent, this forfeiture under CALCRIM No. 3472 applies "even if [the victim's lethal escalation] requirements of CALCRIM No. 3471" are met. A mutual combatant therefore may end a fistfight with a knife or a bullet, and the defendant who intended only fisticuffs must lay down his life without defending it. The prosecutor adopted this position, but the Attorney General does not, conceding a defendant may defend himself in those circumstances. The dissent's position is not the law. (*Conkling*, *supra*, 111 Cal. at p. 626 ["party first at fault" does *not* "absolutely forfeit[] to the other his right to live"].) As the dissent recognizes, *Enraca* is distinguishable because the defendant's evidence showed only his deadly intent, not a nondeadly confrontation, and as we explained, *Hinshaw* similarly turned on the defendant's intent to provoke a "deadly" quarrel. (*Hinshaw*, *supra*, 194 Cal. at p. 26.) The dissent and CALCRIM No. 3472 make no distinction between deadly and nondeadly force, nor an opponent's escalation to deadly force. The distinction makes all the difference. Defendants were entitled to have the jury consider their imperfect self-defense claim.

15

### III

### DISPOSITION

The judgment is reversed.

ARONSON, ACTING P. J.

I CONCUR:

THOMPSON, J.

FYBEL, J., Dissenting.

I respectfully dissent. The conviction of Armando Apolinar Ramirez (Armando) for the first degree murder of Ruben Rivera should be affirmed. The jury was properly instructed, without objection by any party, on both perfect and imperfect self-defense based on legal principles affirmed by the California Supreme Court in *People v. Enraca* (2012) 53 Cal.4th 735, 761-762 (*Enraca*) and *People v. Hinshaw* (1924) 194 Cal. 1, 26 (*Hinshaw*). The jury thereafter found Armando shot and killed Rivera and was guilty of premeditated murder. There is no dispute substantial evidence supported the jury's decision. In brief, the majority and I disagree on the answer to the basic question of what is California law on subjects covered by the instructions given in this case.

The majority opinion reverses Armando's conviction on the ground the trial court erred by instructing the jury with an unmodified version of CALCRIM No. 3472. CALCRIM No. 3472 is entitled "Right to Self-Defense: May Not Be Contrived" and states: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force." By its express language, CALCRIM No. 3472 does not apply to every person who initiates a fight and subsequently claims self-defense. Instead, it applies to a subset of individuals who not only instigate a fight, but do so with the specific intent that they contrive the necessity for their acting thereafter in "self-defense," and thus justify their further violent actions. In other words, this instruction applies, and the right to self-defense is lost, only if an initial aggressor commences combat for the intended purpose of provoking a violent reaction so that he or she can then retaliate with further violence, whether deadly force or nondeadly force, under the guise of self-defense. The defendant's intent is measured at the time the fight or quarrel is provoked.

In *Enraca*, *supra*, 53 Cal.4th at page 761, the California Supreme Court held that CALJIC No. 5.55, the predecessor to CALCRIM No. 3472, correctly stated the

1

law.  CALJIC No. 5.55, approved in *Enraca,* provided:  "'The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.'"  (*Enraca, supra*, at p. 761.)  CALCRIM No. 3472 is more favorable to a defendant than CALJIC No. 5.55 because the former instruction specifically required that the defendant's act of provoking a fight or quarrel be made with the intent to create an excuse to "use force" before the defendant would be precluded from asserting the right of self-defense.

In *People v. Hinshaw, supra*, 194 Cal. at page 26, the California Supreme Court approved an instruction as "correctly stat[ing] the recognized principle of law 'that self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault.'"

In my view, given the legal principles articulated in *Enraca* and *Hinshaw*, CALCRIM No. 3472 accurately states sound legal precedent.

In *Enraca*, the Supreme Court also approved the use of CALJIC No. 5.17, through which "the jury was also instructed that the principle of imperfect self-defense 'is not available, and malice aforethought is not negated, if the defendant[,] by his unlawful or wrongful conduct[,] created the circumstances which *legally justified* his adversary's use of force.'"  (*Enraca, supra*, 53 Cal.4th at p. 761, italics added.)  In the instant case, the jury was given a special instruction containing the same substance as CALJIC No. 5.17; it stated:  "The principle of imperfect self-defense may not be invoked by a defendant who, through his own wrongful conduct (e.g. the invitation of a physical assault or the commission of a felony) has created circumstances under which his adversary's attack or pursuit is legally justified."

Accordingly, both CALCRIM No. 3472 and CALJIC No. 5.55 contain a scienter requirement.  Neither the special instruction, quoted *ante*, nor its counterpart CALJIC No. 5.17, *ante*, contains any scienter requirement.  Instead, they both limit the

2

loss of the right to claim imperfect self-defense to an adversary's use of force that is *legally justified*, e.g., the adversary's use of force in his or her own self-defense against the initial aggressor's provocation. Hence, if the initial aggressor simply provokes a fight using nondeadly force—without an intent to create a larger conflict for the purpose of covering for him or her to engage in further violence in the name of self-defense—he or she is not precluded from claiming self-defense or imperfect self-defense in responding to the adversary's response of deadly force.

Here, as in *Enraca*, *supra*, 53 Cal.4th 735, instructing the jury with CALCRIM No. 3472 was supported by the record because substantial evidence showed Armando, along with Victor Espudo Ramirez, Jr. (Victor), and Steven Arevalos, not only provoked the fight with rival gang members, but Armando, for his part, did so with the intent of creating a circumstance (a sudden fistfight between rival gang members) in which he might have the excuse of self-defense to use his gun against his adversaries. Specifically, substantial evidence showed (1) Armando, Victor, and Arevalos agreed to confront a rival gang whose members had repeatedly driven by Armando's house, sometimes flashing gang signs and guns and even shooting at Armando's house; (2) Armando initially brought a gun to take with him but agreed to leave it at home when Arevalos told him not to bring it; (3) Armando pretended he had put the gun back inside his house before they drove to confront rival gang members, but he actually had secreted it in his sweatshirt pocket; (4) during the drive, Victor told Armando, "[i]f you have a gun, you better use it and not be a bitch"; (5) Armando, Victor, and Arevalos located and then walked up to a group of rival gang members whom they "hit up" by asking, "[w]here you from"; (6) expert witness testimony explained that such "hit up[s]" usually result in some kind of violence "at the minimum, a fistfight"; (7) a fistfight broke out during which Armando fatally shot Rivera after, Armando claimed, he saw Rivera with what looked like a gun in his hand; and (8) no gun was found on or even near Rivera.

3

As noted by the majority, Armando testified that he did not set out that evening intending to shoot anyone. Accordingly, the evidence supported the trial court in the instant case instructing the jury with CALCRIM No. 3472 and also with CALCRIM No. 3471, which as discussed *post*, addresses self-defense in the context of mutual combat or initial aggressors. (The jury was also instructed on imperfect self-defense with CALCRIM No. 571 and the special instruction discussed *ante*).

Having been so instructed, the jury was entitled to conclude, under CALCRIM No. 3472, that Armando did not have the right to claim self-defense in his killing of Rivera because Armando not only provoked the fistfight with the rival gang members, he specifically intended, through the provoked fistfight, to have the contrived opportunity to use further force in the ensuing fracas. The jury was further entitled to conclude that Armando took advantage of that opportunity and killed Rivera. Quite simply, under these circumstances, the jury was entitled to disbelieve Armando's testimony that he did not set out that night intending to shoot anyone.

Given the correctness of the instructions and the evidence, it is justified and logical that the trial court, defense counsel, and the prosecutor all agreed the instructions could be given to the jury. Courts statewide often face the fact pattern of this case: an armed gang member travels to hit up a rival gang with the intent to use force, a gang member then shoots a rival gang member, and the shooter claims afterwards that he or she only shot because the shooter thought his or her adversary was reaching for a gun. The majority thus leaves trial courts in an untenable position: a CALCRIM instruction is proposed, no one objects, all counsel agree it can be given, the evidence supports the instruction, the California Supreme Court has twice approved essentially the same instruction, and yet it is reversible error to give the instruction.

The majority opinion does not explain how CALCRIM No. 3472 might be modified for the majority to conclude the instruction accurately states the law as it would apply to the facts of this case. The majority opinion's final paragraph begins: "In

4

essence, the instructions and the prosecutor's argument erroneously required the jury to conclude that in contriving to use force, even to provoke only a fistfight, defendants entirely forfeited any right to self-defense." (Maj. opn., *ante*, at p. 14.) It appears the majority would modify CALCRIM No. 3472 to do no more than restate principles that *were* given to this jury in the form of CALCRIM No. 3471.

Specifically, CALCRIM No. 3471 instructed the jury about the right to self-defense in the context of mutual combat or a conflict in which the defendant is the initial aggressor as follows: "A person who engages in mutual combat or who starts a fight has a right to self-defense only if: [¶] 1. He actually and in good faith tried to stop fighting; [¶] AND [¶] 2. He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting; [¶] AND [¶] 3. He gave his opponent a chance to stop fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight. [¶] *However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting or communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting.* [¶] A fight is mutual combat when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose." (Italics added.)

CALCRIM No. 3472 instructs that even if initial aggressors or mutual combatants satisfy the requirements of CALCRIM No. 3471, they are not permitted to assert the right to self-defense if they initially engaged in that activity for the purpose of contriving the opportunity to engage in further violence in response to their adversary's reaction. The majority does not give CALCRIM No. 3472's phrase, "with the intent to create an excuse to use force," any meaning or weight in its analysis of whether

5

CALCRIM No. 3472 accurately states the law when it is that very phrase that distinguishes it in substance and purpose from CALCRIM No. 3471.

The majority opinion quotes extensively from the prosecutor's closing argument and rebuttal argument, asserting the prosecutor compounded the impact of the claimed error contained in CALCRIM No. 3472 by reiterating the instruction's misstatement of the law. (Maj. opn., *ante*, at pp. 5-6, 8-9.) For the reasons I have explained, CALCRIM No. 3472 contains a proper statement of the law as confirmed by *Enraca* and *Hinshaw*. The majority does not assert that the prosecutor made any objectionable statements that were inconsistent with CALCRIM No. 3472. Because there was no instructional error, analysis of the prosecutor's statements is unnecessary to evaluate prejudice. Armando and Victor did not argue prosecutorial misconduct in this appeal.

The majority's reliance on *People v. Vasquez* (2006) 136 Cal.App.4th 1176 (*Vasquez*) is misplaced as that case did not involve contrived self-defense as set forth in CALCRIM No. 3472 or otherwise. The appellate court in *Vasquez* held the trial court erred by refusing to instruct the jury on imperfect self-defense, explaining in part, "the defense is available when the victim's use of force against the defendant is unlawful, even when the defendant set in motion the chain of events that led the victim to attack the defendant." (*Vasquez*, *supra*, at pp. 1179-1180.) (The jury in the instant case was instructed on imperfect self-defense with both CALCRIM No. 571 and the special instruction discussed *ante*.)

In *Vasquez*, the trial court refused to instruct the jury on imperfect self-defense, in part, because the court concluded the defendant had "created the need to defend himself by luring [his victim] to the alley to confront him." (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1179.) *Vasquez* did not address whether the defendant set up the confrontation with his adversary "with the intent to create an excuse to use force" (CALCRIM No. 3472) because it was simply not at issue. The majority opinion states

6

that language in *Vasquez*, criticizing an interpretation of self-defense as unavailable to a defendant "who 'induces a quarrel that leads to an adversary's attack'" (*Vasquez*, *supra*, at p. 1179), has "echo[ed] the words of CALCRIM No. 3472" (maj. opn., *ante*, at pp. 12-13). Not so. CALCRIM No. 3472 has an additional scienter requirement, namely, an "*intent* to create an excuse to use *force*." (Italics added.) It does not simply focus on whether inducement of a quarrel *leads* to an adversary's attack.

By relying on the holding of *Vasquez*, the majority appears to conflate two different issues: first, a defendant "set[ting] in motion the chain of events" (*Vasquez*, *supra*, 136 Cal.App.4th at p. 1180) that led to his or her adversary's violent reaction, and second, the defendant "provok[ing] a fight or quarrel with the intent to create an excuse to use force" (CALCRIM No. 3472). These two actions are not the same. The California Supreme Court's decision in *People v. Conkling* (1896) 111 Cal. 616, 626, simply addresses the first issue; consequently, the court rejected the legal principle that "the party first at fault—the one beginning the affray—*absolutely* forfeits to the other his right to live, to the extent at least of the difficulty which he has created." (Italics added.)

Unlike *Vasquez*, in our case, the jury was instructed on imperfect self-defense in the form of CALCRIM No. 571 and the special instruction quoted *ante*. The appellate court in *Vasquez* did not address whether the defendant was precluded from the right to self-defense because he provoked a fight or quarrel with the intent to create an excuse to use force.

The majority's reliance on factual differences between our case and *Enraca* is without moment. In *Enraca*, the Supreme Court held the jury was properly instructed with CALJIC No. 5.55 in the context of the evidence that the defendant participated in a gang fight during which he grabbed one victim by the hair, pulled his head back, and asked where he was from. (*Enraca*, *supra*, 53 Cal.4th at p. 744.) After the victim hit the defendant's hand, the defendant fatally shot him; the defendant explained he was afraid the victim was about to shoot him with a gun the defendant had not seen. (*Ibid.*) The

7

defendant thereafter shot a second victim because he feared that victim was about to grab the same gun he had not seen. (*Ibid.*) Nothing in *Enraca* supports the majority's intimation that CALCRIM No. 3472 is inapplicable unless the defendant provokes a fight or quarrel with the use of deadly force. Neither *Enraca*, nor any legal authority I have found, supports such a limitation of CALCRIM No. 3472. Notwithstanding *Enraca*'s disparate facts, the legal principles affirmed therein still control in our case. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

I would also reject Armando's other instructional and evidentiary challenges raised in this appeal, and affirm his conviction. Following the opinion of the California Supreme Court in *People v. Chiu* (2014) 59 Cal.4th 155, I would reverse Victor's first degree murder conviction and remand with the same disposition in *Chiu*. In *Chiu*, the court held that "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id.* at pp. 158-159.)


FYBEL, J.


8